UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

GABY FRAIFER,

    Debtor.
_____/

Chapter 11
Case No.: 8:22-bk-02423-MGW

DISH NETWORK L.L.C.,

    Plaintiff,

v.

GABY FRAIFER

    Defendant.
_____/

Adversary Proceeding No. _____

**COMPLAINT TO DETERMINE DISCHARGEABILITY
OF DEBT OWED TO DISH NETWORK L.L.C.**

Plaintiff, DISH Network L.L.C. ("DISH"), by and through its undersigned counsel, sues Gaby Fraifer ("Fraifer" or "Debtor"), and in support states:

**JURISDICTION**

1. This is an adversary proceeding brought by DISH, objecting to the discharge of the debt owed by Debtor to DISH, under 11 U.S.C. § 523(a).

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b).

3. This is a core proceeding that the Court is authorized to hear and determine under 28 U.S.C. § 157(b)(2)(I).

4. Venue is proper pursuant to 28 U.S.C. § 1409(a) and Local Rule 1071-1 of the United States Bankruptcy Court for the Middle District of Florida.

## CONDITIONS PRECEDENT

5. All conditions precedent to the bringing of this action have been performed, waived or excused.

## BACKGROUND FACTS

### The Federal District Court Case

6. On March 15, 2017, DISH filed an amended complaint for willful direct copyright infringement under 17 U.S.C. § 501 against Fraifer, Tele-Center, Inc. ("TCI"), Planet Telecom, Inc. ("PTI") ("Federal District Court Complaint") in the United States District Court for the Middle District of Florida, Tampa Division ("Federal District Court"). A true and correct copy of the Federal District Court Complaint is attached hereto as **Exhibit 1**.

7. On December 13, 2021, the Federal District Court made its findings of fact and conclusions of law on DISH's claim for willful direct copyright infringement against Fraifer. A true and correct copy of the Federal District Court's Memorandum Opinion is attached hereto as **Exhibit 2**.

8. On April 19, 2022, the Federal District Court entered a final judgment in favor of DISH on DISH's claim for willful direct copyright infringement against Fraifer. A true and correct copy of the Order and Federal District Court Judgment is attached hereto as composite **Exhibit 3**.

9. In addition to the amount of the Federal District Court Judgment, the Federal District Court ruled that DISH is entitled to recover its attorney's fees and costs pursuant to 17 U.S.C. § 505 and Fed. R. Civ. P. 54(d) due to Fraifer's intentional, deliberate and willful direct infringement of DISH's copyrights.

10. DISH previously sought to liquidate this amount with the Federal District Court (see **Exhibit 4**), but the amount of the fees has not been liquidated.

### Debtor, Tele-Center, Inc. and Planet Telecom, Inc.

11. This action arises from the willful and malicious copyright infringement committed by Fraifer in conjunction with TCI and PTI.

12. Fraifer, at all relevant times, was the sole shareholder and officer of TCI and PTI.

13. From June 25, 2015 to May 3, 2017, PTI had no source of revenue, no employees, was a department within TCI, shared office space with TCI, and its work was performed by employees of TCI.

### DISH and DISH's Copyrights

14. DISH at all relevant times was a pay-television provider that aired certain television programming, including certain popular, copyrighted Arabic-language television channels and programming, which included four audiovisual works registered with the United States Copyright Office ("Registered Works") and 55 audiovisual works not registered with the United States Copyright Office ("Unregistered Works") (together, "Works"), that aired on channels licensed exclusively to DISH ("Protected Channels").

15. The Works were first published outside the United States in countries that are parties to copyright treaties with the United States. Other entities initially owned the copyrights in the Works.

16. DISH received the exclusive right to distribute and publicly perform the Works in the United States through written and signed agreements, valid under the Copyright Act.

17. DISH at all relevant times held valid and exclusive copyright licenses to distribute and publicly perform the Works in the United States.

**Fraifer's Willful and Malicious Copyright Infringement**

18. Fraifer's copyright infringement consisted of Fraifer's transmission of the Works airing on Protected Channels to content delivery networks ("CDNs") with the use of encoders for further transmission to customers via UlaiTV and AhlaiTV branded set-top boxes and associated subscription or service plans ("STBs") sold by Fraifer to customers that allowed the customers to view the Works without having to compensate DISH.

19. Customers who purchased the STBs would connect their television sets to the internet through the STBs and would receive the Works through the internet.

20. The STBs allowed the customers to view the Works without paying additional charges. Had the customers chosen to obtain the Works from DISH, they would have been charged at least $80 per month.

21. Fraifer sold the STBs for a one-time charge of $90 from approximately 2009 to at least May 3, 2017.

22. Fraifer also charged an additional $90 per year for service plans that were used for the purpose of transmitting the Works on the Protected Channels to such customers.

23. Fraifer, TCI and PTI transmitted the Protected Channels, showing the Registered and Unregistered Works, on at least 861 separate occasions from June 2015 through May 2017.

24. Fraifer claimed that the quality of the customer viewing experience of watching television over the internet using only the STBs was inconsistent and problematic.

25. To improve this, Fraifer used CDNs that Fraifer combined with the STBs to improve the customers' viewing experience of the Works.

26. A CDN is a group of geographically distributed internet servers that speeds up delivery of data over the internet by bringing it closer to where end users are physically located.

27. CDNs allow for more stable, secure internet connectivity across geographically distant points, and they are able to balance loads, which avoids high traffic bottlenecking.

28. Fraifer, TCI and PTI's use of a CDN placed the Protected Channels closer to the customers using the STBs and avoided server overload.

29. Protected Channels were delivered to customers using the STBs from the CDNs based upon server load and latency, rather than having all such customers routed to only a single server, possibly located far away and unable to accommodate all such customers' concurrent requests for a Protected Channel.

30. Fraifer admitted to using most of the CDNs that were used to transmit the Works on the Protected Channels.

31. While Fraifer denied using other CDNs that were used to transmit the Works on the Protected Channels, these CDN stream URLs were associated with names that are remarkably similar to the names of Fraifer, TCI and PTI—"Gaby Fraser" and "Planet Telecom Intl."—and were associated with a street address identical to a billing address used by Fraifer, TCI and PTI.

32. Fraifer also combined the STBs and CDNs with additional technology consisting of encoders.

33. Encoders are a type of computer that transforms video programming into formats suitable for streaming over the internet.

34. Fraifer used the encoders to "push" or transmit the Works, onto Fraifer's CDNs for transmission to the STBs.

35. Fraifer used between 21 and 25 encoders located in Florida ("Tampa Encoder") and Germany ("Germany Encoders").

36. Adib Sfeir, a TCI employee, pushed Protected Channels to CDNs from the Tampa Encoder.

37. Fraifer also attempted to conceal his activities related to the Tampa Encoder.

38. Fraifer asserted that Sfeir was using the Tampa Encoder out of Sfeir's own interest and without Fraifer's knowledge.

39. However, the Tampa Encoder was located at the offices of Fraifer, TCI and PTI.

40. The CDN provider reported errors to Fraifer regarding the Protected Channels pushed from the Tampa Encoder.

41. Sajid Maqsood another employee of Fraifer, TCI and PTI, used the Tampa Encoder to push channels to the CDNs.

42. Fraifer also retained Maqsood to provide consulting services related to the Tampa Encoder.

43. Certain IP addresses were assigned to Fraifer, TCI and PTI from a company in Germany known as Cetel GmbH, and as of November 13, 2017, the IP addresses corresponded with locations in Germany ("Cetel IPs").

44. Fraifer, TCI and PTI used the Cetel IPs with the Germany Encoders to push channels to Fraifer, TCI and PTI's Verizon CDN for transmission to STBs.

45. The Cetel IPs were registered in Fraifer's name.

46. Fraifer took elaborate steps to attempt to conceal his activities related to the Germany Encoders.

47. Fraifer asserted that the Cetel IPs were registered in his name by others, but Fraifer's assertion was undermined by other evidence.

48. For example, Fraifer, TCI and PTI used one of the Cetel IPs for an unrelated component of their business involving telephone services.

49. Additionally, records from a PayPal account created in the name of Fraifer's brother, Faraj Fraifer, located in Canada, showed payments of approximately $5,000 and $6,000 were made to Cetel.

50. Despite Fraifer's denials of using this PayPal account or instructing Faraj Fraifer to make the payments, the log-in addresses for the PayPal account at the time each Cetel payment was made, were from an IP address used at Fraifer, TCI and PTI's Tampa offices.

51. The Paypal account registered to Faraj Fraifer in Canada was accessed 351 times over a five-month period, and 345 of the 351 logins were from Fraifer's Tampa offices.

52. The registration record for the Cetel IPs also identifies the name of a former TCI employee.

53. Maqsood also testified that Fraifer, TCI and PTI had at least 21 encoders based on information Fraifer, TCI and PTI relayed to him for purposes of troubleshooting issues with CDNs and providing his CDN consulting services to Fraifer, TCI and PTI.

54. Fraifer testified that he had no communications with Cetel.

55. But when confronted with an email Fraifer sent to Cetel regarding channel streams, Fraifer asserted that Fraifer sent that email for Maqsood.

56. However, Maqsood was copied on the email.

57. Maqsood had also sent other emails to Cetel around the exact same time.

58. Fraifer and Sfeir also had numerous communications with the CDN providers demonstrating that Fraifer personally operated the Germany Encoders.

59. The communications show Maqsood worked with the CDNs to resolve issues concerning delivery of Protected Channels to the STBs.

60. Fraifer included Cetel on his communications with the CDN providers when an issue arose concerning Protected Channels pushed from the Germany Encoders.

61. Fraifer transmitted the Works to customers regularly over a period of years.

62. Fraifer, TCI and PTI or their CDN companies were sent 182 notices of copyright infringement concerning works aired on the Protected Channels immediately prior to or during the time period the Works were aired ("Infringement Notices").

63. Fraifer, TCI and PTI received 7 of the Infringement Notices emailed to their counsel.

64. Fraifer, TCI and PTI also received 58 of the Infringement Notices emailed directly to them.

65. Fraifer, TCI and PTI received, but refused to accept, 17 Infringement Notices mailed to Fraifer, TCI and PTI's Tampa offices or Fraifer's home, most having been returned with handwritten notations stating, "Wrong Address," "Refused," or similar words of rejection.

66. The CDN Providers were emailed 100 of the Infringement Notices.

67. Fraifer, TCI and PTI received at least 39 of the 100 Infringement Notices emailed to the CDN Providers.

68. Of the 182 Infringement Notices, 62 concerned the MBC1, MBC3/Kids, and MBC Masr channels on which the four Registered Works aired and were sent to Fraifer, TCI and PTI or their CDN companies prior to the time that the Registered Works aired on those Protected Channels.

69. Several of the Infringement Notices were sent to multiple email addresses associated with Fraifer, TCI and PTI's website domain names that included either: (1) gabyf@planettelecom. com, which was Fraifer's primary email account that he checked regularly during the 2015 to 2017 time period that the Infringement Notices were sent; or (2) sales@ulaitv.com, which Defendants used to communicate with users of their STBs during that same time period.

70. The Infringement Notices plainly stated, and Fraifer understood, that Protected Channels should not be delivered to customers using the STBs because the Works that aired on the Protected Channels were protected by copyright.

71. Fraifer, TCI and PTI attempted to avoid the legal implication of the Infringement Notices, and gave the false impression of compliance, by temporarily removing or deactivating the Protected Channels identified in the Infringement Notices, but then knowingly and intentionally reinstated or reactivated the Protected Channels at a later point in time.

72. After receiving certain Infringement Notices, Verizon, one of the CDN providers, terminated Fraifer, TCI and PTI's CDN services due to the pattern of Fraifer, TCI and PTI taking down Protected Channels and immediately putting them back up.

73. Fraifer, TCI and PTI acquired backup CDN services that could be used to deliver Protected Channels to customers in the event that Fraifer, TCI and PTI's existing CDN provider terminated Fraifer, TCI and PTI's CDN services in response to the Infringement Notices.

74. Fraifer, TCI and PTI's infringement continued for eight months after DISH sued Fraifer in Federal District Court.

75. Fraifer's use of CDNs to transmit the Works to customers that purchased the STBs constituted unlawful public performances, which were volitional acts directed at DISH's

copyrighted materials under 17 U.S.C. §§ 101 and 106(4) and so constituted willful direct copyright infringement.

76. Fraifer's use of the Tampa Encoders and Germany Encoders to transmit the Works on the Protected Channels to the CDNs also constituted unlawful public performances, which were volitional acts directed at DISH's copyrighted materials under 17 U.S.C. §§ 101 and 106(4) and so constituted willful direct copyright infringement..

77. The Federal District Court ruled that Fraifer is personally liable for all copyright infringement resulting from his own direct, intentional, deliberate and willful infringement of DISH's copyrights, as well as the actions of TCI and PTI because Fraifer: (a) was the sole officer of TCI and PTI and not only had the ability to supervise the infringing activity but did in fact supervise infringing activity by at least two individuals who reported to him; (b) had a financial interest in the infringing activity because he was the sole owner of TCI and PTI and stood to receive all the profits, and; (c) was deeply involved in the day-to-day activities of TCI and PTI and personally participated in the substantial infringing activity.

78. In the Memorandum Opinion, the Federal District Court stated "[Fraifer, TCI and PTI] have demonstrated a general disregard for the legal system by attempting to disguise their use of encoders to infringe [DISH]'s copyrights, and after getting caught, attempting to 'explain away' their actions with, at best, misleading testimony in the trial of this matter." Memorandum Opinion, p. 36.

79. Fraifer willfully and maliciously infringed DISH's copyright rights as evidenced by, among other things: (1) knowingly transmitting the Works that allowed the customers to view the Works without having to compensate DISH; (2) knowingly using the CDNs and encoders as described above to aid Fraifer's transmission of the Works; (3) knowingly selling the STBs to such

customers; (4) directing and supervising the infringing activity by at least two individuals who reported to him; (5) personally participating in and profiting from the infringing activity; (6) repeatedly ignoring the Infringement Notices; (7) taking strategic measures to avoid the legal implications of the Infringement Notices by temporarily ceasing to transmit the Protected Channels identified in the Infringement Notices, but then subsequently knowingly and intentionally transmitting the Protected Channels at a later point in time, and; (8) attempting to disguise his use of encoders to infringe DISH's copyrights and providing misleading testimony about the use of encoders during the trial.

80. On June 17, 2022, Fraifer filed his petition under Chapter 11 of the Bankruptcy Code in this Court resulting in a stay of the Federal District Court Case that was subsequently lifted to permit liquidation of DISH's attorneys' fees and costs as well as for adjudication of Fraifer's motion to amend the Federal District Court Judgment.

## COUNT I
### Objection to Dischargeability Under 11 U.S.C. § 523(a)(6)

81. DISH re-alleges and incorporates herein the allegations contained in paragraphs 1 through 80 above.

82. 11 U.S.C. §523(a)(6) provides that an individual debtor is not discharged from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

83. Fraifer intentionally infringed DISHs' rights to copyrighted television programming as described above, and Fraifer's infringement was both willful and malicious.

84. Fraifer's acts resulted in injury to DISH and benefits to Fraifer.

11

85. DISH is entitled to a determination that the Federal District Court Judgment and DISH's costs and reasonable attorneys' fees pursuant to 17 U.S.C. § 505 expended in relation to Fraifer's intentional, deliberate and willful infringement of DISH's copyrights, are excepted from discharge under section 523(a)(6).

WHEREFORE, DISH requests this Court enter judgment against Fraifer determining that the amount of the Federal District Court Judgment and DISH's costs and reasonable attorneys' fees expended in relation to litigating Fraifer's willful direct infringement of DISH's copyrights in the Federal District Court are excepted from discharge. DISH requests all such other and further relief as this Court deems just and proper.

Respectfully Submitted,

SEQUOR LAW, P.A.
1111 Brickell Ave., 12th Floor
Miami, Florida 33131
Telephone: 305-372-8282
Facsimile: 305-372-8202
Email: dcoyle@sequorlaw.com
afinley@sequorlaw.com

By: */s/ Daniel M. Coyle*
Daniel M. Coyle
Florida Bar No. 55576
Amanda Finley
Florida Bar No. 100225