*EXHIBIT "2"*

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

DISH NETWORK L.L.C.,

     Plaintiff,

v.                                 Case No. 8:16-cv-2549-TPB CPT

GABY FRAIFER, TELE-CENTER, INC.,
and PLANET TELECOM, INC.,

     Defendants.

_____/

### <u>MEMORANDUM OF DECISION</u>

     This matter was tried without a jury, pursuant to Federal Rule of Civil

Procedure 52, from June 1, 2021, to June 3, 2021.  The parties were invited to

submit written closing arguments and proposed findings of fact and conclusions of

law.  The last of the parties' lengthy post-trial submissions was received on July 31,

2021.

### <u>Background</u>

     Plaintiff Dish Network L.L.C. ("Plaintiff") initially filed this action on August

30, 2016, and an amended complaint was filed on March 15, 2017.  Plaintiff's

amended complaint includes only one count -- a claim for direct violation of the

Copyright Act, 17 U.S.C. § 101, *et seq*.  Plaintiff seeks monetary and injunctive relief

against three separate Defendants:  Tele-Center, Inc. ("TCI"), Planet Telecom, Inc.

("PTI"), and Gaby Fraifer, an individual ("Fraifer").  This Court has subject matter

jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338.

Plaintiff alleges it is a valid licensee of various copyrighted television programming, and Defendants directly infringed its copyrights through the sale and distribution of television set-top boxes ("STBs") and associated technology known as UlaiTV and AhlaiTV.  Plaintiff alleges that the STBs and associated technology allowed customers (sometimes referred to as "end users") who purchased STBs to view popular, copyrighted Arabic Language television programming, such as "Al-Jazeera," without having to compensate the copyright holders.

It is important to note at the outset that Plaintiff is not claiming the mere sale and distribution of STBs directly infringed its copyrights.  Rather, Plaintiff contends that Defendants supplemented the STBs with additional technology that, taken together, constituted direct copyright infringement.  Specifically, Plaintiff alleges that Defendants controlled and used "content delivery networks" and "encoders" in connection with their sale and delivery of STBs.  According to Plaintiff, the addition of either of these technologies transformed Defendants' mere sale of STBs into actionable direct copyright infringement.

Defendants admit they sold and distributed the STBs at issue here, and that they supplemented their service with content delivery networks.  However, they challenge the validity of Plaintiff's copyrights, deny they used encoders, and deny that any of their activities constituted direct copyright infringement.

This case represents another "skirmish in the long-running copyright battle over the delivery of television programming." *Am. Broad. Cos., Inc. v. Aereo, Inc.*, 573 U.S. 431, 451 (2014) (Scalia, J., dissenting).  Deciding the factual and legal

issues in this case requires the Court to delve into the highly technical, and
seemingly ever-changing, details of modern television broadcasting and "streaming"
over the internet.  Both the law and the technology in this area are constantly
evolving.

## I. Conclusions of Law

### *Copyright Law*

To make out a prima facie case of copyright infringement, a plaintiff must
show, by a preponderance of the evidence, that (1) it owns a valid copyright in the
works at issue and (2) the defendants copied protected elements from the
copyrighted works.  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361
(1991); *Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290 (11th Cir. 2011) (citing
*Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., Int'l*, 533 F.3d
1287, 1300 (11th Cir. 2008)).  "A preponderance of the evidence simply means an
amount of evidence that is enough to persuade you that the Plaintiff's claim is more
likely true than not true."  Eleventh Circuit Pattern Jury Instruction 3.7.1 (2020).

"[T]he owner of [a] copyright ... has the exclusive right[] ... to perform the
copyrighted work publicly."  17 U.S.C. § 106(4).  Copying means to violate any
exclusive right of copyright, including the right to publicly perform an audiovisual
work.  *See id*.  "To perform ... a work 'publicly' means [among other things] to
transmit ... a performance ... of the work ... to the public ..."  17 U.S.C. § 101.

Infringement of the public performance right protected by 17 U.S.C. § 101 is
not confined to the content originator; instead, each party involved in the process of

performing an audiovisual work may be subject to liability. Both a broadcaster and a viewer of a television program may "perform, because they both show a program's images and make audible the program's sounds." *Am. Broad. Cos. v. Aereo, Inc.*, 573 U.S. at 432 (internal quotation omitted). An intermediary involved in delivery of internet television services may "publicly perform" even where its conduct consists only of capturing and retransmitting a broadcast "in automatic response" to an end user's request. *Id.* at 443-44.

Direct "[c]opyright infringement is a strict liability offense in the sense that a plaintiff is not required to prove unlawful intent or culpability." *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 89 (2d Cir. 2016). Secondary, or indirect copyright infringement is a means of holding defendants responsible for infringement by third parties, even when the defendants "have not themselves engaged in the infringing activity." *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 435 (1984). It applies when a defendant "intentionally induc[es] or encourag[es]" infringing acts by others or profits from such acts "while declining to exercise a right to stop or limit [them]." *Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005).

Where exact copies of copyrighted works are transmitted to viewers, a "substantial similarity" analysis – that is, the Court comparing the Works owned to the Works infringed – is not required. *See, e.g.*, *Baby Buddies, Inc. v. Toys R Us, Inc.*, 611 F.3d 1308, 1315 (11th Cir. 2010); *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1248 (11th Cir. 1999).

The substantial non-infringing defense, which bars imputing knowledge or intent for a secondary copyright infringement claim based on the sale of a product used to infringe if that product also had a substantial non-infringing use, is not applicable in a direct infringement case. *See Spanski Enters., Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904, 913 (D.C. Cir. 2018).

Liability for copyright infringement may arise where copyrighted programming originates from outside the United States and is transmitted (streamed) into the United States. *Id.* at 913-16 (finding public performance right infringed because programming was streamed to viewers in the United States and thus it was immaterial that the programming was originally uploaded and formatted in Poland); *see Nat'l Football League v. PrimeTime 24 Joint Venture*, 211 F.3d 10, 12-13 (2d Cir. 2000) (finding infringement because "a public performance . . . includes 'each step in the process by which a protected work wends its way to its audience'" and at least one step in transmitting the programming occurred in the United States) (citation omitted).

### *Summary Judgment Determinations*

Copyright validity was determined in Plaintiff's favor through summary judgment proceedings before Magistrate Judge Tuite prior to commencement of the trial in this matter. However, at the trial in this matter Defendants sought to vacate that determination. Vacating [an] earlier order [is] within the district court's power." *Bon Air Hotel, Inc. v. Time*, Inc., 426 F.2d 858, 862 (5th Cir. 1970); *see also Region 8 Forest Serv. Timber Purchasers Council v. Alcock*, 993 F.2d 800, 806 (11th

Cir. 1993)("Rule 54(b) confirms the Court's power to reconsider its interlocutory orders. The Court has discretion in deciding whether to reconsider a previous order."). A court may grant reconsideration under Rule 60(b)(6) "in order to do substantial justice[.]" *Griffin v. Swim-Tech Corp.*, 722 F.2d 677, 680 (11th Cir. 1984) (reconsidering partial summary judgment). Likewise, a court may reconsider its own order granting partial summary judgment under its inherent powers. *See Ligotti v. United Healthcare Servs.,* 2021 WL 2333111, at *5 (S.D. Fla. June 8, 2021) ("We could always reconsider the summary judgment order under our inherent authority because 'a court's previous rulings may be reconsidered as long as the case remains within the jurisdiction of the district court.'" (citing *Oliver v. Orange Cty.*, 456 F. App'x 815, 818 (11th Cir. 2012)).

However, a party cannot ordinarily use a Rule 59(e) motion to relitigate old matters, raise new arguments, or present evidence that could have been raised prior to the entry of judgment; such a motion should only be granted based on newly-discovered evidence or a manifest error of law. *Levinson v. Landsafe Appraisal Services, Inc.*, 558 F. App'x 942, 946 (11th Cir. 2014) (citing *Michael Linet, Inc. v. Village of Wellington, Fla.*, 408 F.3d 757, 763 (11th Cir. 2005)). Evidence is not newly-discovered where the moving party could have obtained the information by deposition or moved for a continuance. *Id.* (affirming denial of motion for reconsideration where party seeking reconsideration could have anticipated that the deposition of a named defendant might have produced evidence that they would

have wanted to cite in opposition to a motion for summary judgment) (citing *Waddell v. Hendry Cnty. Sheriff's Office*, 329 F.3d 1300, 1310 (11th Cir. 2003)).

### The Parties

Plaintiff has brought this action against three separate Defendants. Separate corporations may be treated as alter egos if various factors are present including common ownership, common officers, common business departments, one funding the other, one paying the salaries and expenses of the other, one having grossly inadequate capital, and the daily operations of the companies not being kept separate. *United Steelworkers of Am., AFL-CIO-CLC v. Connors Steel Co.,* 855 F.2d 1499, 1505 (11th Cir. 1988).

"An individual, including a corporate officer, who has the ability to supervise infringing activity and has a financial interest in that activity, or who personally participates in that activity is personally liable for the infringement." *S. Bell Tel. & Tel. Co. v. Associated Tel. Directory Publishers,* 756 F.2d 801, 811 (11th Cir. 1985).

### Relief

Pursuant to § 504(c)(1) of the Copyright Act, an owner may elect to recover statutory damages in lieu of any other form of monetary relief. *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1271 (11th Cir. 2015) (citing *F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233 (1952)). "The Copyright Act's statutory damages provision is designed to discourage wrongful conduct. The range of statutory damages is between $750 and $30,000 for each infringed work, but the Act also allows 'the court in its discretion [to] increase ... award[s] of

statutory damages' in cases involving willful infringement to $150,000 per work."
*Id*. (citations omitted).  Willfulness in this context "means that the defendant
'knows his actions constitute an infringement; the actions need not have been
malicious.' " *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 851
(11th Cir.1990).  Willfulness also includes a "reckless disregard of the possibility
that one's actions are infringing a copyright." *Yellow Pages Photos,* 795 F.3d at
1272.  "In its broad discretion for determining statutory damages, the district court
should consider both the willfulness of the defendant's conduct and the deterrent
value of the sanction imposed." *Cable/Home Commc'n Corp.,* 902 F.2d at 852.

"In its broad discretion for determining statutory damages, the district court
should consider both the willfulness of the defendant's conduct and the deterrent
value of the sanction imposed."  *Id.*  "Even for uninjurious and unprofitable
invasions of copyright the court may, if it deems it just, impose a liability within
statutory limits to sanction and vindicate the statutory policy."  *F. W. Woolworth
Co.*, 344 U.S. at 233.

The Copyright Act authorizes an award of attorney's fees to a prevailing
party.  The amount of fees is determined in the court's discretion and in accordance
with the "*Fogerty* factors."  *See Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994); *Malibu
Media, LLC v. Pelizzo*, 604 F. App'x 879, 881 (11th Cir. 2015).  Thus, an award of
attorney's fees may be appropriate, but not required, when willful copyright
infringement has been proven.

A plaintiff seeking a permanent injunction must demonstrate that: (1) it has

suffered irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering balance of hardships between the plaintiff and defendant, remedy in equity is warranted; and (4) public interest would not be disserved by permanent injunction. *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Irreparable injury may be established by lost subscription revenues, market share, damage to business reputation, all of which are inherently difficult, if not impossible to calculate, and for which there is no adequate remedy at law. *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005); *Ferrellgas Partners, L.P. v. Barrow*, 143 F. App'x 180, 190 (11th Cir. 2005) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill."); *see also Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) ("[C]ourts have tended to issue injunctions in this context [involving copyright infringement] because 'to prove the loss of sales due to infringement is notoriously difficult.'")

## II. Factual Determinations

### *The Parties*

Plaintiff is a pay-television provider that airs various television programming, including the Arabic language channels and programming at issue in this case. Plaintiff provides its programing by means of satellite delivery and "over-the-top" services, whereby programming is delivered using a public internet

infrastructure.  Plaintiff alleges it held exclusive licenses to air the programming at issue in this case.

Fraifer founded TCI and PTI and was always the sole shareholder of TCI and PTI.  Fraifer served continuously as the sole officer of TCI and PTI from at least June 25, 2015, to May 3, 2017.  PTI had no source of revenue, no employees, and was a department within TCI from June 25, 2015, to May 3, 2017.  TCI shared office space with PTI, paid PTI's expenses, and employees of TCI performed the work of PTI from June 25, 2015, to May 3, 2017.  TCI and PTI were effectively the same company from June 25, 2015, to May 3, 2017.  As such, all Defendants are generally referred to collectively here as "Defendants."

Defendants began selling STBs around 2009 or 2010.  In addition, Defendants sold and distributed prepaid telephone calling cards and pre-paid long-distance cards from 2013 to 2016.  By May 3, 2017, Defendants stopped selling STBs and ceased conducting business.

### *Copyright Validity*

The validity of the copyrights at issue here was vigorously and thoroughly litigated before this Court over a period of years.  The issues presented were complex, detailed, and involved intricate, unfamiliar technical information, as well as challenging legal concepts such as determination of copyright validity under the Berne Convention and the application of foreign law.[1]  Copyright validity was determined in Plaintiff's favor through summary judgment proceedings before

---

[1] The nations involved here included the UAE, Qatar, Lebanon, Egypt, Cyprus, and Saudi Arabia.

Magistrate Judge Tuite prior to commencement of the trial in this matter.[2]

Judge Tuite entered a very detailed 57-page Report and Recommendation, which thoroughly, meticulously, and accurately analyzed the difficult issues presented. (Doc. 246). Both parties filed detailed objections to Judge Tuite's Report and Recommendation, and both parties filed responses to each other's objections. After carefully considering the many objections raised, the Court adopted the Report and Recommendation. (Doc. 257). At that point, Defendants then sought permission to file an interlocutory appeal pursuant to 28 U.S.C. § 1292(b), which was denied. (Docs. 261; 267).

Rather than accept the Court's ruling on copyright validity, reserving of course their right to pursue appropriate appellate remedies, Defendants chose to rehash essentially the same arguments on copyright validity, yet again, in the trial of this matter by claiming, *inter alia*, they discovered new evidence in depositions that were taken after the aforementioned summary judgment proceedings.[3] Among the wide-ranging arguments raised in support of this claim, Defendants assert that the Declarations provided by Plaintiff, and relied upon by the Court, in support of its summary judgment determination on copyright validity were not made on

---

[2] In addition to determining the copyright validity issues in Plaintiff's favor, Judge Tuite recommended granting summary judgment in Plaintiff's favor on Defendants' counterclaim. In that counterclaim, Defendants attempted, unsuccessfully, to sue Plaintiff for breach of contract arising out of Plaintiff indirectly acquiring STBs for the purpose of investigating the copyright claims presently before this Court.

[3] This case was filed on August 30, 2016, and the extensive summary judgment proceedings took place from 2018 through 2020, but the depositions in question were not taken until May 2021, less than 30 days before the trial in this matter commenced, and nearly five *years* after this action was filed.

personal knowledge.

In reality, no *material* new information came to light after Defendants lost the copyright validity argument on summary judgment.  Almost all the many arguments Defendants raised at the trial on copyright validity were previously raised -- and rejected -- in the summary judgment proceedings.  Indeed, Defendants devoted roughly the first 37 pages of their 75-page written Closing Argument (Doc. 333) to re-arguing the copyright validity issue they lost at summary judgment.  And over 40 pages of Defendants' 134-page Proposed Findings of Fact and Conclusions of Law (Doc. 336) are devoted to re-arguing the copyright validity issue.  And, for good measure, in their post-trial submissions, Defendants chose to include additional arguments on copyright validity that were never part of the case or even raised during the trial.[4]

After losing an issue on summary judgment, a party cannot generally relitigate old matters, raise arguments or present evidence that could have been raised prior to the entry of judgment unless there is newly-discovered evidence or a manifest error of law. *See Levison v. Landsafe Appraisal Services, Inc.*, 558 F. App'x 942, 946 (11th Cir. 2014) (quoting *Michael Linet, Inc. v. Village of Wellington, Fla.*,

---

[4] For example, approximately 9 of Defendants' 134-pages of Proposed Findings of Fact and Conclusions of Law (Doc. 336) were devoted to arguing the applicability of the Digital Millennium Copyright Act ("DMCA"), which provides a limitation on liability for online service providers against claims of copyright infringement. 17 U.S.C. § 512.  But Defendants never pled a DMCA safe harbor affirmative defense in their answers, did not argue that defense at the trial, and included nothing about that defense in their 75-page Closing Argument (Doc. 333).  All arguments regarding the DMCA were waived and are therefore denied without further comment.

408 F.3d 757, 763 (11th Cir. 2005)). Evidence is not newly-discovered where the moving party could have obtained the information by deposition or moved for a continuance. *Levison*, 558 at 946. While a court has the inherent power to reconsider its own summary judgment orders, that discretionary authority is rarely, if ever, exercised absent newly-discovered evidence or a manifest error of law.

Defendants had more than a fair opportunity here to develop the factual bases for the legal arguments they now make regarding copyright validity prior to receiving an adverse summary judgment ruling on that issue. While they may have identified certain factual information that was not previously known or included in their summary judgment filings, that information is not material, and it does not rise to the level of newly-discovered evidence, suggest a manifest error of law, or any other injustice of any kind. None of Defendants' many arguments regarding copyright invalidity are well-taken -- they all lack merit and are all rejected.

The Court's summary judgment Order established Plaintiff's ownership of valid copyrights in certain "Registered Works" and "Unregistered Works."[5] The "Registered Works" consist of four audiovisual works registered with the United States Copyright Office that aired on "Protected Channels" exclusively licensed to Plaintiff by the MBC Network. All four MBC Registered Works were registered with the United States Copyright Office within three months of their first publication. The "Protected Channels" consist of the MBC Channels, AJAN Al Jazeera channels, World Span Channels, Dream 2 Channel, and IMD Channels.

---

[5] The terms of that Order (Doc. 246 and 257) are incorporated herein by reference.

The "Unregistered Works" consist of fifty-five audiovisual works not registered with the United States Copyright Office that aired on "Protected Channels."[6]

Plaintiff established that other entities initially owned the asserted copyrights in the Registered Works and the Unregistered Works. Plaintiff also established that it received the exclusive right to distribute and publicly perform the Registered and Unregistered Works in the United States through signed, written agreements that are valid under the Copyright Act. Plaintiff proved first publication of the Unregistered Works in foreign countries that are treaty parties and as a result, these works are protected under the Act even though they have not been registered.

For the reasons expressed above, and as explained more fully in the summary judgment Orders, Plaintiff has established, by a preponderance of the evidence, the first element of its claim for copyright infringement -- that it owns, or is an assignee, of valid copyrights in the works at issue. *See Saregama India Ltd.*, 635 F.3d at 1290; *Peter Letterese & Assocs.,* 533 F.3d at 1300.

### *Infringing Conduct*

The second element that Plaintiff must prove is that "[D]efendants copied protected elements from the copyrighted works." *Saregama India Ltd.*, 635 F.3d at 1290; *Peter Letterese & Assocs.,* 533 F.3d at 1300. Due to the technology involved in this case, the question of whether "[D]efendants copied protected elements from the

---

[6] Plaintiff's trial exhibits 85-86 identify the 4 "Registered Works," 20 "Protected Channels," and 55 "Unregistered Works" by name, along with the Networks that exclusively licensed that content to Plaintiff.

copyrighted works" is far from a simple, straightforward inquiry. Rather, the Court must delve into the unfamiliar, seemingly ever-changing, and highly technical details of modern television broadcasting over the internet presented by the unique facts of this case.

Plaintiff alleges that Defendants "copied" its copyrighted works in two different ways. First, Plaintiff argues that Defendants controlled and used content delivery networks to transmit Plaintiff's copyrighted works over the internet to STBs that Defendants sold to the public. Second, Plaintiff claims that Defendants utilized computer devices known as encoders to "push" copyrighted works onto Defendants' content delivery networks for transmission to the STBs.

Defendants sold and distributed television STBs known as UlaiTV and AhlaiTV from approximately 2009 through 2017. Customers who purchased one of Defendants' STBs would connect their television sets to the internet through the STBs, and the television signal, or programming, was received through the internet, as opposed to coming through a cable, a satellite, or by reception of traditional broadcasting over public airwaves. Defendants generally sold the STBs to for a one-time charge of $90. The STBs, among other things, allowed end users to view certain popular Arabic language television programming without paying additional charges. Had customers chosen to obtain this same content from Plaintiff, the charge would have been at least $80 per month.

The vast majority, but not all, of the STBs at issue here were manufactured in China by an entity known as Lenkeng, who was not a party to this action. The

STBs came pre-programed with an Android operating system that functioned like any other Android-based computer or smart mobile device, which come preloaded with software applications such as YouTube, Netflix, and Google Pay for use in connection with the internet. The STBs arrived equipped with software or an application that pointed or linked to channels already available on the internet, as well as hardware or a player that converted the links to something watchable over the internet. Defendants did not make any technological or software changes or modifications to the STBs they received from Lenkeng before distributing them to the public.

However, Defendants did more than simply reselling STBs manufactured by a separate entity in China. The evidence demonstrated that Defendants supplemented the viewing experience for their UlaiTV and AhlaiTV customers by utilizing both content delivery networks and encoders.

<u>Content Delivery Networks</u>

Defendants discovered that the quality of the customer viewing experience watching television over the internet using only an STB was inconsistent, and customers frequently experienced problems. To improve the quality of the viewing experience for their customers, Defendants utilized a technology known as internet content delivery networks ("CDNs").

CDNs are a key aspect of this case from Plaintiff's perspective. However, at the trial, Plaintiff did not provide expert testimony on this important and technical subject, but instead attempted to explain the operation of CDNs mostly through the

testimony of Defendant Fraifer. The evidence demonstrated that a CDN is a group of geographically distributed internet servers that speeds up delivery of data over the internet by bringing it closer to where end users are physically located. CDNs allow for more stable, secure internet connectivity across geographically distant points, and they are able to balance loads which avoids high traffic bottlenecking on the internet. CDNs also provide added security against what are known as DNS attacks where hackers overwhelm an internet service provider's system with automated requests aimed at causing them to crash. Such technology is perfectly legal and various companies, such as Verizon, sell CDN services to the public.

Defendants admitted that they purchased and used CDNs to improve the reliability and stability of their customers' internet viewing experience. Plaintiff chose to present evidence explaining the details of Defendants' involvement with CDNs, but because that evidence is, for the most part, undisputed, it does not need to be discussed in detail. Also, it should be noted that Defendants paid for and operated a technology known as "middleware" in connection with their use of CDNs. The fact that Defendants used Middleware was established at trial, but exactly what this technology accomplished was not effectively explained at the trial in this matter.

Likewise, Plaintiff did not adequately explain how its copyrighted programming got onto Defendants' system in the first place for transmission over CDNs to STBs. Plaintiff addresses this factual question by making a legal point that it does not really matter because Defendants can be liable for direct copyright

infringement if they participated in any part of the process of infringement. Defendants provided a factual answer to this question. They claimed that a substantial portion, and perhaps all, of the copyrighted programming at issue here was publicly available on the internet for free, and their STBs simply provided their customers with URL links that allowed customers to access and view what they could access and view on their own, for free, without a STB or a CDN.[7] Defendants' explanation appears to be accurate.

In any event, there is no question that Defendants were heavily involved in utilizing CDNs to improve their customers' viewing experience. Defendants admit to using CDNs, but they argue that such use did not constitute direct copyright infringement. That issue will be discussed below.

<u>Encoders</u>

While it may be true that a substantial portion, and perhaps all, of the copyrighted programming at issue here was publicly available on the internet for free and could be accessed through URL links, the evidence at trial established that Defendants also utilized computer devices known as "encoders" to "push" programming onto their CDNs, where it was then transmitted to STBs for viewing by end users.

Encoders are a second key aspect of this case from the Plaintiff's perspective.

---

[7] URL is the abbreviation for "uniform resource locator," which is the "global address of documents and other materials on the World Wide Web." BLACK'S LAW DICTIONARY (10th ed. 2009). The following is an example of what a URL might look like -- http://www.example.com/index.html

However, just as with CDNs, Plaintiff did not provide expert testimony on this important and highly technical subject, but instead attempted to explain encoders through Defendants' witnesses. In its simplest form, the evidence showed that encoders are a type of computer that transforms programming into formats suitable for streaming over the internet. Significantly, Defendants used encoders to "push" or add programming not otherwise readily accessible to their system for transmission to STBs.

While Defendants admitted using CDNs -- but argued that such use was not a direct copyright violation -- they strongly *denied* using encoders. Defendants' evidence on this point was not credible. Rather, the evidence clearly established that they utilized encoders to "push" programming onto their CDNs and that programming traveled over the internet to STBs, where it was available for viewing by end users. The question of how Plaintiff's copyrighted programming got onto the encoders in the first place was not adequately explained by either side.

The evidence established, beyond a reasonable doubt, that Defendants regularly utilized encoders in both Tampa, Florida, and Germany to "push" programming onto their CDNs. Although Fraifer flatly denied using encoders to infringe copyrights, his own emails contradict his sworn testimony and conclusively prove that he extensively and covertly used encoders to "push" copyrighted programming onto his system for viewing by end users.[8] Fraifer emailed Verizon

---

[8] *See* Plaintiff's Trial Exhibit 17 (Doc. 325-13), which includes numerous emails to and from Fraifer concerning encoders. Additional emails concerning encoders can be found in Joint Trial Exhibits 3 (Doc. 327-9) and 4 (Doc. 327-10).

between February 25, 2016, and May 4, 2016, and stated "I stopped pushing," "I stopped," or "I reset" channels that Verizon identified as coming from the Germany Encoders. Fraifer emailed Verizon between February 10 and February 12, 2016, with respect to pushing channels from Germany encoders, and stated that "we stopped the . . . Stream pushing for now" and asked Verizon to advise "if you want me to push it later on from the same encoder." Fraifer sent his email less than one hour after receiving Verizon's request that he investigate an issue regarding the channels pushed from the Germany encoders. Furthermore, Fraifer emailed Verizon on February 4, 2016, in response to an email he received regarding the Germany encoders, and asked that Verizon "make sure they don't do any blocking on any of our encoders, as it is all in production, and we have live streams that [are] serving our customers online."

In addition to Fraifer's own emails, the testimony of Sajid Maqsood ("Maqsood"), a consultant that Defendants retained in 2015, confirmed the fact that encoders were being used on a regular basis. Mr. Maqsood testified in his deposition that Defendants had at least 21, and perhaps as many as 25 encoders, including encoders in Germany.

With respect to the encoders located in Tampa Florida, the evidence demonstrated that Adib Sfeir ("Sfeir"), who was employed by TCI for about 13 years, pushed channels to Defendants' Verizon CDN from an encoder, consisting of a computer and Wowza software, located at Defendants' Tampa offices. This was established by, among other evidence, emails between Sfeir and Verizon where Sfeir

emailed Verizon asking for confirmation that a channel was being sent properly to the Verizon CDN from "our encoders" and stated that he was using one of the IP addresses associated with Defendants' Tampa offices.  Sfeir then emailed Verizon a short time later and stated, "channel stream names we are pushing to your ingest," where he identified several of Plaintiff's copyrighted programs.  Mr. Sfeir was called to testify in the trial and when he was asked about emails he wrote and received specifically dealing with encoders, he claimed he could not remember anything about encoders.  Both his answers and his demeanor demonstrated he was being less than forthcoming with the Court on the subject of encoders.  The emails that were introduced in evidence clearly demonstrated that Mr. Sfeir worked with encoders as part of his work for Defendants.  The fact that he refused to so acknowledge during his testimony suggests he understood that using encoders was problematic.  The evidence at trial also demonstrated that another individual, Mr. Maqsood, also used a Tampa encoder to push channels to the Defendants' Verizon CDN.

Similarly, there is no question that Defendants used encoders located in Germany to "push" programming onto their system for viewing by end users who had purchased STBs.  The fact that Defendants operated the encoders in Germany was clearly established by Fraifer and Sfeir's email communications with Verizon.

Defendants took rather elaborate steps to cover-up their activities relating to the German encoders.  In the criminal law arena this evidence might be characterized as "consciousness of guilt."  Certain IP addresses were assigned to

Defendants from a company in Germany known as Cetel GmbH, and as of

November 13, 2017, the IP addresses corresponded with locations in Germany

("Cetel IPs").  Significantly, the Cetel IPs were registered in Defendant Fraifer's

name.  The evidence demonstrated that encoders located in Germany associated

with the Cetel IPs were used to push channels to Defendants' Verizon CDN for

transmission to STBs.

Fraifer's convoluted attempts at trial to explain his email communications

about encoders was, at best, not credible and at worst, a deliberate premeditated

attempt to mislead the Court.  For example, he claimed that the Cetel IPs must

have been registered in his name by someone else without his knowledge, perhaps

Lenkeng or Maqsood.  But, as it turns out, records from a PayPal account created *in

the name of Fraifer's brother*, Fraj Fraifer, located in Canada, showed payments of

approximately $5,000 and $6,000 were made to Cetel.  Why would Fraifer's brother

in Canada be paying a German company for IP addresses that were used by a

Chinese company, Lenking, for encoders to push Arabic programming to end users

in the United States?

When asked about this in the trial, Fraifer denied using the PayPal account

or instructing his brother to make the payments to Cetel.  However, the log-in

addresses for the PayPal account at the time each Cetel payment was made, were

from an IP address used at Defendants' Tampa offices.  In other words, somebody in

Tampa was logging onto a Paypal account registered to Fraifer's brother in Canada

and making payments to Cetel.  When confronted with this information, Fraifer

attempted to explain that his brother would work from his (Defendant's) Tampa offices when visiting from Canada and must have accessed the PayPal account at those times. That claim is very difficult to accept as true in light of the fact that the Paypal account registered to Fraifer's brother in Canada was accessed 351 times over a five-month period, and 345 of the 351 logins were from Defendants' Tampa offices.

The large payments to Cetel, which flowed through a Paypal account registered to Fraifer's brother in Canada, confirm Maqsood's testimony that Defendants had at least 21 encoders, including encoders located in Germany.

In sum, the evidence was very clear that Defendants utilized encoders in both Tampa, Florida, and Germany to "push" programming onto their CDNs and that programming traveled over the internet to STBs, where it was available for viewing by end users.

### Plaintiff's Copyrighted Programming Traveled Over Encoders and CDNs Controlled by Defendants

The evidence clearly established that Defendants created a system using CDNs and encoders to facilitate transmission of programming to STBs. But exactly which specific programming was transmitted, and on what dates, was less clear. It is not enough, of course, for Plaintiff to prove that "programming" in general traveled over the internet in the way it alleges. To prevail on a copyright claim, Plaintiff must also prove that the programming that traveled over Defendants' system was Plaintiff's copyrighted programming. Defendant vigorously contests Plaintiff's proof on this key point.

To prove that their copyrighted programming traveled over Defendants' system, Plaintiff relies on the work of an expert, Pascal Metral ("Metral"). Metral, an attorney currently residing in Switzerland, testified at trial and prepared a detailed report that was received in evidence. Metral identified 861 instances, including specific dates, where "Protected Channels" were transmitted to users of Defendants' STBs. "Protected Channels" included programming from four Networks -- MBC, Al Jazeera, IMD, and World Span -- that exclusively licensed their programming to Plaintiff. Metral's investigation involved, among other things, watching television programming using Defendants' STBs, taking screenshots of programs observed, and identifying the video stream URLs corresponding with the CDNs used in transmitting the Protected Channels to STBs. The process was automated at times and located thousands of miles from Metral's location in Switzerland, but reviewed by a security technician for accuracy.

Metral's findings were confirmed by the deposition testimony of representatives from the networks that exclusively licensed the Protected Channels to Plaintiff. Each reviewed the findings in Metral's report, including the dates Protected Channels were transmitted to users of Defendants' STBs and corresponding screenshots. Furthermore, the Networks identified specific, copyrighted audiovisual works exclusively licensed to Plaintiff that were depicted in the screenshots or that otherwise aired on the Protected Channels on the dates the channels were transmitted to STBs as indicated in Metral's report.

Defendants attacked the reliability of Metral's conclusions on several fronts

including, but not limited to, his alleged lack of qualifications, bias, lack of error rate, and unreliable process and methodology.  They also point out that Plaintiff failed to enter into evidence at trial copies of the asserted registered or unregistered audiovisual works or infringing audiovisual works.

Metral supervised the monitoring and investigation of copyright infringement on behalf of the International Broadcaster Coalition Against Piracy ("IBCAP").  He did so in his capacity as Vice President in charge of anti-piracy operations for his employer Nagravision SA, and he was responsible for investigating not only Defendants' STBs but also more than 100 additional television streaming services on behalf of members of IBCAP.  Metral was not paid for his report, but instead provided it and served as an expert witness as part of his duties as an employee of Nagravision SA.

It should be recognized that the IBCAP is not an impartial third-party public interest center or otherwise independent entity.  Rather, it appears to be an organization created by entities such as Plaintiff for the purpose of, among other things, policing copyright violations.  Plaintiff was instrumental in forming and funding IBCAP.  The depositions of World Span and Al Jazeera confirmed that Plaintiff required them to participate in IBCAP, and certain contracts contain provisions acknowledging that Plaintiff formed IBCAP and required entities such as Al Jazeera to make financial contributions to fund IBCAP.  Moreover, the parties stipulated to the fact that "at some point" between 2016 and 2017, an individual named Chris Kueling simultaneously served as Plaintiff's former Senior Vice

President of international programming and as Executive Director of IBACP.

Metral is the General Counsel and employee of Nagravision, which is a joint-venture partner with Plaintiff in an entity known as NagraStar LLC. The parties stipulated that prior to 2017, Plaintiff's sister company, EchoStar, was joint-venture partner under NagraStar LLC. Taken together, it appears that Metral worked closely with Plaintiff during the years leading up to and during the pendency of the instant case. Indeed, Metral admitted that he sent copyright infringement notifications to Defendants' CDNs in this matter. Metral is an attorney and he testified he does not have a background or a degree in computer science or any technology. As of the date of his Report, he had not testified as an expert witness at a deposition or a trial in the past four years, had not authored any publications in the last ten years, and while he has testified in other proceedings outside the United States, he has never been accepted as an expert by any court in the United States.

The Court is certainly skeptical of purported expert testimony, on a highly technical subject such as this, from a lawyer in Switzerland with no technical training and who has done legal work for the party in the case that hired him. Similarly, it appears that the IBACP is a self-interested trade association that has pooled its resources to protect the intellectual property of its members. Plaintiff's case would have been much stronger had it chosen to retain a true independent technical expert who could have explained the challenging technical aspects of this case, including CDNs, encoders, URLs, and STBs. Plaintiff has instead, apparently,

made a business decision to pursue enforcement using "in house" resources as opposed to retaining truly independent investigators and experts.

That having been said, Metral's analysis is sound, and his conclusions are reliable. For the most part, his analysis is very straightforward – he simply identifies television programming that aired over the internet on certain days and times. Periodic monitoring supervised by Metral indicated that Plaintiff's copyrighted programming was received by users of Defendants' STBs on at least 861 instances. The Court is not convinced that this information is reliable as to each and every specific detail, but the Court is convinced, in a general sense, that Metral's analysis accurately demonstrates that Plaintiff's copyrighted programming was received by STBs regularly over a period of years.

It should be noted, however, that Metral's report is silent on the subject of encoders. While it is abundantly clear that Defendants were using encoders to "push" programming onto their CDNs for consumption by end users, it is important to recognize that Metral's work does not establish that; he did not address encoders. Rather, the fact that Defendants were "pushing" Plaintiff's copyrighted programming onto their CDNs for consumption by end users is established by Defendants' emails and witness testimony.

In sum, the evidence established Defendants sold and distributed STBs; provided CDNs that improved the delivery and quality of programming; and utilized encoders to "push" programming onto CDNs for transmission to STBs for viewing by end users. The evidence further established the programming that

traveled over Defendants' system, as described above, included Plaintiff's copyrighted works. But whether any of this activity constituted direct copyright infringement requires further analysis.

### III. Application of the Law to the Facts

Plaintiff has only sought relief for direct, as opposed to secondary, copyright infringement. The technology at issue here appears to present a question of first impression; the parties have not identified any decisions involving this precise factual scenario and the Court's own independent research has found nothing.

The controlling decision from the United States Supreme Court in this area is *Am. Broad. Cos. v. Aereo, Inc.*, 573 U.S. 431 (2014). In *Aereo,* the Supreme Court was called on to decide whether an internet-based television service provider directly infringed copyrights "by selling its subscribers a technologically complex service that allows them to watch television programs over the Internet at about the same time as the programs are broadcast over the air."

Here, Plaintiff does not claim the mere selling of STBs, with the particular software that was installed by a Chinese company, constituted direct copyright infringement. It does assert, however, that Defendants' selling of STBs, supplemented with CDNs to enhance the end user's viewing experience, constituted direct copyright infringement. Under *Aereo,* this particular technology presents a close case on the question of direct copyright infringement.

*Aereo* involved a technology whereby subscribers wanting to watch a show currently airing would select the show from a menu on Aereo's website and Aereo's

system, which consisted of thousands of small antennas and other equipment housed in a centralized warehouse, would automatically tune an antenna, by computer, for the use of one subscriber alone, to the broadcast carrying the selected show. Something called a "transcoder" translated the signals received by the antenna into data that could be transmitted over the internet.[9] A server saved the data in a subscriber-specific folder on Aereo's hard drive and began streaming the show to the subscriber's screen once several seconds of programming were saved. The streaming continued, a few seconds behind the over-the-air broadcast, until the subscriber has received the entire show.

The U.S. Supreme Court held, in a 6-3 decision, that this technology constituted direct copyright infringement. The Court's reasoning is directly applicable here. Section § 106(4) of the Copyright Act provides that "[T]he owner of [a] copyright ... has the exclusive righ[t] ... to perform the copyrighted work publicly." And "[t]o perform ... a work 'publicly' means [among other things] to transmit ... a performance ... of the work ... to the public ..." 17 U.S.C. § 101. Just as in *Aereo*, the precise legal issues presented here are whether Defendants "transmit ... a performance" when an end user watches a show using Defendants' system, and whether the performance was transmitted "publicly."

In reaching its decision the majority opinion in *Aereo* placed great weight on the fact that the Copyright Act was amended by Congress in 1976 to overturn prior

---

[9] A very interesting question, which was not discussed by the parties in this case, is whether the "transcoder" device involved in *Aereo* is the exact same, or at least the same general technology, as the "encoder" devices used by Defendants here.

Supreme Court caselaw holding that "community antenna television (CATV)

systems (the precursors of modern cable systems) fell outside the Act's scope."  As

the Court explained,

> In *Fortnightly Corp. v. United Artists Television, Inc.,* 392 U.S. 390, 88 S.Ct.
> 2084, 20 L.Ed.2d 1176 (1968), the Court considered a CATV system that
> carried local television broadcasting, much of which was copyrighted, to its
> subscribers in two cities. The CATV provider placed antennas on hills above
> the cities and used coaxial cables to carry the signals received by the
> antennas to the home television sets of its subscribers. The system amplified
> and modulated the signals in order to improve their strength and efficiently
> transmit them to subscribers.  A subscriber "could choose any of the ...
> programs he wished to view by simply turning the knob on his own television
> set."  *Id.,* at 392, 88 S.Ct. 2084. The CATV provider "neither edited the
> programs received nor originated any programs of its own." *Ibid.*

As such, the *Fortnightly* Court held that the technology involved there did *not*

constitute direct copyright infringement.

The *Aereo* Court also discussed another case that resulted in Congress

amending the Copyright Act, *Teleprompter Corp. v. Columbia Broadcasting System,*

*Inc.,* 415 U.S. 394 (1974).  In *Teleprompter,*

> the Court considered the copyright liability of a CATV provider that carried
> broadcast television programming into subscribers' homes from hundreds of
> miles away. Although the Court recognized that a viewer might not be able to
> afford amplifying equipment that would provide access to those distant
> signals, it nonetheless found that the CATV provider was more like a viewer
> than a broadcaster. *Id.,* at 408–409, 94 S.Ct. 1129. It explained: "The
> reception and rechanneling of [broadcast television signals] for simultaneous
> viewing is essentially a viewer function, irrespective of the distance between
> the broadcasting station and the ultimate viewer." *Id.,* at 408, 94 S.Ct. 1129.

Similar to its holding in *Fortnightly,* the *Teleprompter* Court also held that the

technology involved there did *not* constitute direct copyright infringement.

As explained in *Aereo,* in response to decisions such as *Fortnightly* and

*Teleprompter,* in 1976 Congress broadened the scope of the Copyright Act to bring the activities of cable systems, such as those exemplified by *Fortnightly* and *Teleprompter,* within the scope of the Copyright Act.

Here, Defendants' STBs provided their customers with URL links that allowed customers to access and view what they could access and view on their own, for free, without a STB or a CDN. Plaintiff has not argued that Defendants' act of selling STBs, by itself, constitutes direct copyright infringement. However, Plaintiff claims that by adding CDNs into the mix, Defendants "crossed the line" into direct copyright infringement. While this is a close case, Defendants' conduct seems quite similar to what the cable provider was doing in *Fortnightly:*

> The CATV provider placed antennas on hills above the cities and used coaxial cables to carry the signals received by the antennas to the home television sets of its subscribers. *The system amplified and modulated the signals in order to improve their strength and efficiently transmit them to subscribers.* A subscriber "could choose any of the ... programs he wished to view by simply turning the knob on his own television set."

(emphasis added). As previously noted, Congress amended the Copyright Act in 1976 to cover this kind of activity. Accordingly, pursuant to *Aereo*, Defendants' act of selling STBs, together with providing associated CDNs to enhance the end user's viewing experience, constitutes transmission of a performance pursuant to 17 U.S.C. §§ 101 and 106(4).

The next question is whether Defendants' technology resulted in it "publicly" transmitting a performance as required by § 106(4). "To perform or display a work 'publicly' means--

(1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

(2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times."

17 U.S.C. § 101. By their distribution of STBs enhanced by CDNs, Defendants did "otherwise communicate a performance . . . to the public, by means of any device or process." Accordingly, pursuant to *Aereo*, Defendants' act of selling STBs, together with providing associated CDNs to enhance the end user's viewing experience, constitutes direct copyright infringement.

As previously noted, the technology presented here (STBs, together with CDNs) presents a close case on direct copyright infringement. On the other hand, Defendants' use of encoders to "push" Plaintiff's copyrighted programming onto their CDNs for distribution to STBs is not a close case at all. Encoders are a type of computer that Defendants used to transform Plaintiff's copyrighted works into formats suitable for streaming over the Internet. The evidence established that Defendants used at least 21 encoders, some located in its Tampa, Florida, offices, and some in Germany, to "push" Plaintiff's copyrighted works onto their CDNs for transmission to the STBs Defendants sold to the public. Rather than selling a technology that merely allowed customers to access programming that was publicly available over the internet as Defendants claim, the evidence demonstrated that they also undertook the volitional act of introducing or "pushing" Plaintiff's copyrighted works onto their system for customer viewing. Use of encoders clearly

involved a volitional act directed at Plaintiff's copyrighted materials. *See Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 437, n.18 (1984); *Spanski Enters., Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904, 913-16 (D.C. Cir. 2018) (selecting as well as transmitting copyrighted content demonstrates an active role in copyright infringement and establishes liability for direct copyright infringement). By using encoders, Defendants clearly and directly infringed Plaintiff's copyrights.

## IV. Relief

Pursuant to *S. Bell Tel. & Tel. Co. v. Associated Tel. Directory Publishers,* 756 F.2d 801, 811 (11th Cir. 1985), Fraifer is personally liable for all copyright infringement resulting from his own direct actions, as well as the actions of his companies, TCI and PTI. Fraifer is personally liable for the actions of his companies because he was the sole officer of TCI and PTI and not only had the ability to supervise the infringing activity but did in fact supervise infringing activity by at least two individuals, Sfeir and Maqsood, both of whom reported to him. Fraifer also had a financial interest in the infringing activity because he was the sole owner of TCI and PTI and stood to receive all the profits. But most importantly, he was deeply involved in the day-to-day activities of his companies and personally participated in substantial infringing activity as has been described above.

### *Statutory Damages*

As previously determined, four Registered Works were timely registered with

the USCO for purposes of 17 U.S.C. § 412, thus creating the possibility for Plaintiff to recover statutory damages and attorney's fees under 17 U.S.C. § 504. Defendants' infringement of the Registered Works was willful because Defendants, among other things, repeatedly ignored Infringement Notices; took strategic measures to avoid the legal implications those Infringement Notices; attempted to disguise their use of encoders to infringe Plaintiff's copyrights; and when exposed, "doubled down" by providing, at best, misleading testimony about their use of encoders during the trial in this matter.

Periodic monitoring conducted by Plaintiff's expert indicated that Protected Channels were received by users of Defendants' STBs on at least 861 instances. The Court is not convinced that this information is accurate in every detail, but it is convinced that, in a general sense, Plaintiff's copyrighted programming was received by STBs via CDNs regularly over a period of years. Fraifer's own emails and Masquood's testimony establish that Defendants were regularly using encoders to "push" Plaintiff's copyrighted programming onto their system for consumption by end users.

Defendants were sent 182 notices of copyright infringement concerning works aired on the Protected Channels immediately prior to or during the time period the Works were aired ("Infringement Notices"). Defendants received 7 Infringement Notices emailed to their counsel. Defendants also received 58 Infringement Notices emailed directly to them. Defendants received but refused to accept 17 Infringement Notices mailed to Defendants' Tampa offices or Fraifer's home, most

having been returned with handwritten notations stating, "Wrong Address," "Refused," or similar words of rejection. Defendants received at least 39 of the 100 Infringement Notices that were emailed to Defendants' CDN companies. 62 of the 182 Infringement Notices concerned the MBC1, MBC3/Kids, and MBC Masr channels on which the four Registered Works aired and were sent to Defendants or their CDN companies prior to the time that the Registered Works aired on those Protected Channels. The Infringement Notices plainly stated, and Defendants understood, that Protected Channels should not be delivered to Defendants' STB because works that aired on the Protected Channels were protected by copyright.

Furthermore, the evidence demonstrated that Defendants attempted to avoid the legal implication of the Infringement Notices, and give the false impression of compliance, by temporarily removing or deactivating the Protected Channels identified in the Infringement Notices, but then knowingly and intentionally reinstating or reactivated the Protected Channels at a later point in time. In addition, Defendants acquired backup CDN services that could be used to deliver Protected Channels to end users in the event that Defendants' existing CDN company terminated Defendants' services in response to Infringement Notices. This strategy was apparently developed in response to the fact that Verizon terminated Defendants' CDN services due to their pattern of taking down Protected Channels and immediately putting them back up.

Statutory damages are also necessary to deter future violations of the law. Defendants' infringement continued for eight months after this action was filed,

demonstrating that initiation of a legal proceeding is not an adequate deterrent.

And finally, Defendants have demonstrated a general disregard for the legal system by attempting to disguise their use of encoders to infringe Plaintiff's copyrights, and after getting caught, attempting to "explain away" their actions with, at best, misleading testimony in the trial of this matter.

For all of the foregoing reasons, Plaintiff is awarded **$150,000** in statutory damages for each of the four Registered Works, for a total of **$600,000**, as authorized under 17 U.S.C. § 504(c). Because the Court has awarded a higher amount in statutory damages than Plaintiff has sought in actual damages, it is assumed that Plaintiff would elect to receive an award of statutory damages, and the matter of disgorgement of profits is not considered.[10] All three Defendants are each jointly and severally responsible for paying the damages awarded. *S. Bell Tel. & Tel. Co. v. Associated Tel. Directory Publishers,* 756 F.2d 801, 811 (11th Cir. 1985).

### *Injunctive Relief*

A plaintiff seeking permanent injunction must demonstrate that: (1) it has suffered irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering balance of hardships between the plaintiff and defendant, remedy in equity is warranted; and

---

[10] As previously noted, the issue of whether Defendants' use of CDNs alone (without encoders) presents a close question under *Aereo*. If it is determined that Defendants' use of CDNs does not constitute direct copyright infringement, but their use of encoders does, a reduction in damages would not be warranted. Because of Defendants' conduct here in connection with encoders, maximum statutory damages are appropriate even if Defendants' use of CDNs is not actionable as direct copyright infringement.

(4) public interest would not be disserved by permanent injunction. *eBay, Inc. v. MercExchange, L.L.C.* 547 U.S. 388, 391 (2006). Here, Plaintiff has demonstrated all of the elements required to obtain injunctive relief pursuant to *eBay* and 17 U.S.C. § 502.

It was established that end users who purchased Defendants STBs could receive Plaintiff's copyrighted programming by paying a one-time cost of approximately $90, as opposed to paying approximately $80 per month to receive the same programming legally from Plaintiff. Defendants' copyright infringement caused Plaintiff to lose subscription revenues and market share and damaged Plaintiff's reputation – each of which is inherently difficult, if not impossible, to calculate. Thus, Defendants' infringement irreparably harmed Plaintiff in the form of lost subscription revenues and market share and damage to its business reputation, all of which are inherently difficult, if not impossible to calculate, and for which there is no adequate remedy at law.

Here the balance of hardships favors a permanent injunction because, in contrast to the irreparable harm that Defendants' infringement causes Plaintiff, the burden an injunction places on Defendants consists only of the cost of foregoing illegal actions.

Permanently enjoining Defendants will advance the public interest by protecting copyrighted works which by extension maintains the incentive for authors and artists to create new works and for Plaintiff to offer the works to the public.

Therefore, a permanent injunction against Defendants, their officers, agents, servants, employees, or any other persons that are acting in active concert or participation with them is appropriate, and Plaintiff is directed to submit a proposed Injunction to the Court within 30 days.[11]

### *Attorney's Fees*

Due to Defendants' deliberate and willful infringement of Plaintiff's copyrights, Plaintiff is entitled to recover its attorney's fees and costs pursuant to 17 U.S.C. § 505 and Fed. R. Civ. P. 54(d). Plaintiff is directed to file a motion under Fed. R. Civ. P. 54(d)(2) and L.R. 7.01 to establish the amount of its attorney's fees and costs.

## Conclusion

There is no question that Defendants acted willfully and improperly. They knew exactly what they were doing – they knowingly sold STBs, made in China, for $90 that allowed consumers to view an unlimited amount of "pay to view" television programming for free. They knew the STB product, by itself, did not provide an acceptable viewing experience for most consumers, so they provided enhancements that infringed Plaintiff's copyrights. Defendants were asked stop 182 times, but

---

[11] Defendants may, if they wish, file any objections to the terms of the proposed injunction within 10 days of its submission to the Court by Plaintiff. Defendants should not file lengthy objections on the issue of entitlement to injunctive relief, only objections to the proposed terms of the injunction. It is understood and assumed that Defendants object to entitlement.

they kept going.  When they got caught, they provided misleading testimony, under oath, during the trial of this matter.  As such, the relief awarded here is necessary to compensate Plaintiff and to discourage similar future, willful conduct.

  **DONE AND ORDERED** in Chambers, in Tampa, Florida, this 13<u>th</u> day of December, 2021.


                                  

                        **TOM BARBER**
                        **UNITED STATES DISTRICT JUDGE**